# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 13, 2010 Session

## STATE OF TENNESSEE V. KOREY BRADLEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00512     W. Mark Ward, Judge**

---

**No. W2009-02024-CCA-R3-CD  - Filed August 22, 2011**

---

Defendant, Korey Bradley was charged with attempted second degree murder of Brandon Williams, aggravated assault of Brandon Williams, and felony reckless endangerment of Jarvis McDaniel. Following a jury trial, Defendant was convicted of misdemeanor reckless endangerment as a lesser-included offense of attempted second degree murder, and guilty as charged on the aggravated assault and felony reckless endangerment. He was sentenced to eleven months, twenty-nine days for misdemeanor reckless endangerment, eight years for aggravated assault, and three years for felony reckless endangerment. The trial court ordered the eight-year and three-year sentences to be served consecutively with each other and concurrently to the sentence for misdemeanor reckless endangerment for an effective eleven-year sentence to be served in confinement.  On appeal, Defendant argues that (1) his conviction for aggravated assault should be merged into his conviction for misdemeanor reckless endangerment resulting in one conviction for misdemeanor reckless endangerment; (2) the trial court erred by failing to instruct the jury on aggravated assault as a lesser-included offense of attempted second degree murder; (3) the evidence was insufficient to support his convictions for felony reckless endangerment; and (4) his effective sentence was excessive.  After a thorough review of the record, we remand for the trial court to merge the conviction for misdemeanor reckless endangerment of Brandon Williams with the conviction for aggravated assault of Brandon Williams. All other aspects of the judgments are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Criminal Court Affirmed as Modified

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Joseph McClusky, Memphis, Tennessee (on appeal); and Paul Springer, Memphis, Tennessee (at trial) for the appellant, Korey Bradley.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General, William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

On the evening of November 8, 2007, Brandon Williams, the victim of the aggravated assault, was in his home at 2385 Hunter Avenue playing a video game with his nephew, Jarvis McDaniel, the victim of the felony reckless endangerment, when he noticed Defendant in front of his house selling drugs. Mr. Williams said that he was concerned about the activity because his neighbor told him that police had been "busting people in front of - - by her house or in front of her house, and she said that the next time that he catch anybody around our house or in front of our house that he going to come to one of our house." Mr. Williams then walked outside and told the people parking in front of his house to "move on down." He also told Defendant to "go on back down the street with that hot boy stuff because I - - and I'm trying to get them to move at the same time." Mr. Williams explained that "hot boy stuff" is "[r]unning to the cars selling drugs to the people." He said that Defendant then "shoot [sic] off talking crazy" but he "overtalked" Defendant because he did not want an altercation, and Defendant walked away. Mr. Williams then walked back inside his house.

Mr. Williams was in his house for thirty to forty-five minutes and walked back outside to talk to his neighbor, Rico Waller. Jarvis McDaniel also walked outside. At some point, Mr. Williams looked over and saw Defendant walking toward him from the opposite side of the street. Defendant walked up beside Mr. Williams and said "what's that shit you say you going to do to me?" Mr. Williams testified, "And he come up under his coat with a gun. I was like, dang, you going to pistol play me like that? He's like, man, pistol play you, I'll shoot you. I said, shoot me for what?" Mr. Williams attempted to talk to Defendant and calm him down. As Mr. Williams began "easing away," Defendant shot around Mr. Williams's feet three or four times with a forty or forty-five caliber hand gun. Mr. Williams continued walking and as he got to the curb, a bullet struck the back of his leg, breaking it. Mr. Williams fell to the ground, and as he attempted to get up, bullets struck him in the side and one scraped his hip. Defendant then looked at Mr. Williams and said, "f - - k you," and he walked off.

Mr. Williams handed Rico Waller his keys, and he went to get Mr. Williams's car. Mr. Williams was not bleeding heavily and called 911 but did not get a chance to talk to the operator about what happened because the operator was busy telling him to calm down, and

he hung up when Mr. Waller pulled the car around. Mr. Waller and Mr. McDaniel then loaded Mr. Williams in the back seat of his car and drove him to the Med (a hospital in Memphis). When he arrived at the hospital, Mr. Williams was immediately taken into surgery. The wound to his leg was repaired with a plate and nine screws, and his intestines also had to be repaired. Mr. Williams spent one and one-half weeks in the hospital. He did not talk with police during that time because Mr. Waller and Mr. McDaniel had already told them what happened.

On cross-examination, Mr. Williams admitted that he was arrested in 2008, subsequent to the shooting in this case, for having 6.4 grams of cocaine. He said that he was unable to work at the time. He also acknowledged that had sold drugs and possessed a weapon when he was "younger."

Jarvis McDaniel testified that on November 8, 2007, Defendant was in front of Mr. Williams's house "making some kind of transaction or something or whatnot, and my uncle [Mr. Williams] had hollered down the street and told [Defendant], you know, stop doing that, and I quote, hot stuff in front of my house." He said that Defendant "said his piece" and then walked away. Mr. McDaniel testified that Defendant returned around ten minutes later while Mr. Williams was outside talking to Mr. Waller and asked Mr. Williams what he had said. Mr. McDaniel was standing in the yard at the time. He testified:

> And then [Defendant], he pulled the pistol out. And my uncle [Mr. Williams] had said, what, you trying to pistol play me? That mean like you trying to bluff somebody with a pistol.
>
> And Korey said, no, I ain't pistol playing you, I'll shoot you for real. So my uncle was like, okay, okay. That's the problem with you young men today, they all want to shoot and they don't want to fight.

Mr. McDaniel testified that Mr. Williams began walking away toward the house, and Defendant shot. He said that Mr. Williams continued walking toward the house, and Defendant shot again hitting Mr. Williams in the back of the leg. Mr. Williams fell to the side of the curb, "and [Defendant] shot maybe, I don't know, maybe three more times, and [Defendant] just walked away." Mr. McDaniel testified that Defendant said, "f–k him" as he left. Mr. McDaniel said that after that, Mr. Williams was "just laying on the curb, so we just picked him up and threw him in the car, me and Rico, and we drove him to the Med." Mr. McDaniel thought that Mr. Waller called 911, but they did not "wait around."

Mr. McDaniel testified that he heard a total of five to seven shots, and he was standing "maybe eight yards" from Mr. Waller, who was standing beside Mr. Williams, when the

shooting began. Although the gun was not pointed directly at him, Mr. McDaniel was in fear for his safety because "he was shooting that close to me." Mr. McDaniel testified that he gave a statement to police on November 8, 2007, but he did not know Defendant's name at the time. He knew him from the neighborhood, and identified him from a photographic display.

Rico Waller testified that he "wasn't nowhere around" when Mr. Williams was shot. He said that he arrived home from the store and saw Mr. Williams laying on the ground. He said, "I just picked up his keys and helped him to the hospital." Mr. Waller testified that he did not call 911. He later talked with police and told them that he did not know what happened.

Officer Jeffrey Gary of the Memphis Police Department, Crime Scene Unit, testified that he responded to the scene of the shooting and located three spent nine-millimeter shell casings in the street around 2379 Hunter Avenue. Officer Mark Henderson of the Memphis Police Department responded to a "wounding call" at the Med. He was unable to speak with Mr. Williams because he was already in surgery. He then took information from Mr. Waller and Mr. McDaniel.

Sergeant Joseph Benya of the Memphis Police Department, Felony Response Unit, testified that he spoke with Marilyn Waller, who had called 911, and she pointed out the location where Mr. Williams was lying after the shooting. He also interviewed Cassandra Waller and eight young people who were across the street from the shooting. However, they claimed not to know Mr. Williams or the shooter. Sergeant Benya testified that he eventually received information on Defendant and went to Defendant's grandmother's house. He obtained Defendant's full name, date of birth, and a possible location. Sergeant Benya then pulled up all information on Defendant from his computer and forwarded it to the Felony Assault Unit. Defendant was arrested on November 14, 2007, at 2400 Hunter Avenue by Officer John Owens.

Stephanie Berryman, a 911 supervisor for the Memphis Police Department, testified that a 911 call concerning the shooting was received on November 8, 2007, at 5:08 p.m. from Marilyn Waller. The phone number was registered to 2379 Hunter Avenue. Ms. Berryman testified that a second 911 call was received a few seconds later from Mr. Williams' residence at 2385 Hunter Avenue, and then a minute later a third 911 call was received concerning the shooting.

## Analysis

### I. Merger of Convictions

Defendant argues that his conviction for aggravated assault should be merged with his conviction for misdemeanor reckless endangerment because convictions for both crimes violate double jeopardy since they stem from a single event. Therefore, he asserts that the trial court erred in denying his request for a merger of the two offenses. The State agrees that the convictions must be merged, but not in the manner urged by Defendant.

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, under our Tennessee Constitution, "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. Three fundamental principles underlie double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). The case *sub judice* involves the third scenario, that is, multiple punishments for the same offense.

In determining whether two offenses are the "same" for double jeopardy purposes, the *Blockburger* test requires a comparison of the statutory elements of attempted first degree premeditated murder and aggravated assault. *Blockburger v. United States*, 284 U.S. 299, 307, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *State v. Black*, 524 S.W.2d 913, 919 (Tenn. 1975). "If each statutory provision setting forth the offense requires proof of an additional fact which the other does not, then the two offenses are not the same for federal double jeopardy protection purposes. *State v. Hall*, 947 S.W.2d 181, 183 (Tenn. Crim. App. 1997) (citing *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182).

Nonetheless, in *Denton*, "our supreme court extended double jeopardy protection under the Tennessee constitution beyond that provided by the federal constitution." *Hall*, 947 S.W.2d at 183. In addition to the *Blockburger* test, the trial court must consider the "same evidence" test as articulated in *Duchac*, that is whether the same evidence is required to prove the offenses. *Denton*, 938 S.W.2d at 381 (citing *Duchac v. State*, 505 S.W.2d 237, 239 (Tenn. 1973)). This test states in pertinent part:

> A defendant has been in jeopardy if on the first charge he could have been convicted of the offense charged in the second proceeding. One test of identity of offenses is whether the same evidence is required to prove them. If the same evidence is not required, then the fact that both charges relate to, and

grow out of, one transaction, does not make a single offense where two are defined by the statutes.

*Duchac*, 505 S.W.2d at 239.

Finally, the trial court must analyze whether there were multiple victims or discrete acts and compare the purposes of the respective statutes. *Denton*, 938 S.W.2d at 381.

As relevant here, misdemeanor reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.CA. § 39-13-103(b). Aggravated assault, as charged in the indictment, occurs when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and "[C]auses serious bodily injury to another." T.C.A. § 39-13-102(a)(1)(A). It is apparent from a review of the record that the State relied on the same evidence to support Defendant's dual convictions of aggravated assault and misdemeanor reckless endangerment. That is, Defendant's conduct of firing several shots at Mr. Williams resulting in serious bodily injury supported both the misdemeanor reckless endangerment conviction in count one of the indictment and the aggravated assault conviction in count two. *See Hall*, 947 S.W.2d at 183-84 (determining that convictions for attempted second degree murder and aggravated assault violated double jeopardy when the dual convictions were based on the same evidence, and the statutes preventing the crimes had the same purpose, that is "to prevent physical attacks upon persons"); *State v. Adams*, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997) (determining that a single attack by the defendant on the victim which provided the evidence to support the defendant's conviction of both attempted first degree murder and aggravated assault violated double jeopardy principles under the "same evidence" test in Denton); *State v. Marques Lanier Bonds*, No. W2005-02267-CCA-R3-CD, 2006 WL 2663753, at *9 (Tenn. Crim. App., at Jackson, Sept. 15, 2006), *no perm. to appeal filed* (determining that the defendant's convictions for attempted second degree murder and aggravated assault were the same for double jeopardy purposes because they were part of one continuous assault, with each gunshot being used to support dual convictions). Because these convictions fail the *Duchac* prong of the test, we find that principles of double jeopardy bar Defendant's multiple convictions.

Defendant also argues that his aggravated assault conviction should be merged into the misdemeanor reckless endangerment conviction resulting in a single conviction for the misdemeanor offense because it was a double jeopardy violation to charge Defendant with the original offense of attempted second degree murder and aggravated assault based upon the same conduct. Defendant states: "because the double jeopardy violation occurs not in the conviction, but in the charging of a defendant, it stands to reason that the lesser charged offense of aggravated assault should merge into the greater charged conduct."

-6-

However, as pointed out by the State, Defendant's argument is erroneous. It has long been held that in a jury trial, jeopardy does not attach until the jury is empaneled and sworn. *State v. Pennington*, 952 S.W.2d 420, 422 (Tenn. 1997). *Black's Law Dictionary* (8th ed. 2004) defines merger as "[t]he absorption of a lesser included offense into a more serious offense when a person is charged with both crimes, so that the person is not subject to double jeopardy." Therefore, the misdemeanor offense must be merged into the felony offense. *State v. Adams*, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997); *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996); *State v. David Lee Heakin*, No. M2008-01834-CCA-R3-CD, 2010 WL 532863, at * 8 (Tenn. Crim. App. Feb. 16, 2010) *perm. app. denied* (Tenn. Sept. 8, 2010); *State v. Raymond Deshun Ross*, No. W2006-01167-CCA-R3-CD, 2007 WL 3254436, at *10 (Tenn. Crim. App. Nov. 2, 2007) *perm. app. denied* (Tenn. June 30, 2008).

We accordingly remand to the trial court for entry of an amended judgment merging the misdemeanor reckless endangerment conviction with the aggravated assault conviction so that there is one judgment for a conviction for aggravated assault as the matter pertains to Defendant's conduct against Mr. Williams.

## II. Jury Instruction on Aggravated Assault as a Lesser-Included Offense of Attempted Second Degree Murder

Defendant next contends that the trial court erred in failing to instruct the jury on aggravated assault as a lesser-included offense of attempted second degree murder. T.C.A. § 40-18-110 (c) provides in relevant part that "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for new trial or on appeal." The record in this case does not contain any request by Defendant for a jury instruction on aggravated assault as a lesser-included offense of attempted second degree murder, and defendant acknowledges that he failed to raise this issue in the trial court but asserts that it may be reviewed for plain error pursuant to Tenn. R. App. P. 36(b). However, we find no plain error in this issue. This court has held that aggravated assault is **not** a lesser-included offense of attempted second degree murder. *State v. Antonio Braden*, No. M2007-02544-CCA-R3-CD, 2008 WL 4735443, at *4 (Tenn. Crim. App., Oct. 27, 2008) *no perm. app. filed*; *State v. Albert James Saavedra*, No. M2004-02889-CCA-R3-CD, 2006 WL 618299, at *28 (Tenn. Crim. App., Mar. 13, 2006) perm. app. denied (Tenn. Aug. 21, 2006). Defendant is not entitled to relief on this issue.

## III. Sufficiency of the Evidence for Felony Reckless Endangerment

Defendant argues that the evidence presented at trial was insufficient to support his conviction for felony reckless endangerment against victim Jarvis McDaniel because the evidence failed to demonstrate that Mr. Williams was in the "zone of danger."

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

"A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment committed with a deadly weapon, as charged in this case, is a Class E felony. T.C.A. § 39-13-103(b).

In *State v. Payne*, 7 S.W.3d 25 (Tenn. 1999), the Tennessee Supreme Court adopted the following definition of "imminent" from *Black's Law Dictionary:*

> Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening.

7 S.W.3d at 28 (quoting *Black's Law Dictionary* 750 (6th ed.1990)). The court explained that in order "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *Payne*, 7 S.W.3d at 28. The court further explained that the "zone of danger" is "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." *Id*. The *Payne* court reasoned that the state had the duty to "show that a person or class of persons were in an area in which a reasonable probability of danger existed." *Id*.

In a light most favorable to the State, Mr. McDaniel testified that he was standing around eight yards from Mr. Williams when Defendant fired a total of five to seven shots at Mr. Williams. Mr. McDaniel said that although the gun was not pointed directly at him, he was in fear for his life "[b]ecause [Defendant] was shooting that close to me." Mr. Williams testified that Mr. McDaniel was standing in the yard behind him when the shooting began, and he walked toward the curb near the yard as Defendant continued firing at him.

In this case, we find that Mr. McDaniel was in the line of Defendant's fire, within the "zone of danger," and clearly in imminent danger of death or serious bodily injury. There was more that a mere possibility that Mr. McDaniel might have been struck by a bullet. Defendant is not entitled to relief on this issue.

## IV. Sentence Length

Finally, Defendant asserts that his sentence is excessive because the "trial court relied on few factors, some of which it determined should be given little weight." A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has

been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*., 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

It is not disputed that Defendant is a Range II multiple offender based on his two prior felony convictions for aggravated burglary in 2001 and robbery in 2003. The range of punishment as a Range II offender is six to ten years for the Class C felony conviction for aggravated assault, and two to four years for the Class E felony conviction for reckless endangerment with a weapon. T.C.A. § 40-35-112(b)(3), (5). The applicable range of punishment for misdemeanor reckless endangerment was a sentence up to eleven months, twenty-nine days.

The trial court applied enhancement factor (1) that Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (16) that Defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult to Defendant's convictions for aggravated assault and felony reckless endangerment. T.C.A.

§ 40-35-114(1), (16). However, the court did not "put a great deal of weight" on factor (1) because the only prior conviction in addition to those necessary to establish Defendant's range was a misdemeanor drug offense. As for factor (16), Defendant admitted that he was adjudicated in juvenile court for the offense of aggravated robbery at the age of sixteen. The trial court applied enhancement factor (9), that Defendant possessed or employed a firearm, explosive, device or deadly weapon during the commission of the offense, to Defendant's conviction for aggravated assault, but not to the felony reckless endangerment conviction. T.C.A. § 40-35-114(9). The application of factor (9) to Defendant's sentence for felony reckless endangerment is not proper because the indictment indicates that the charge is based on the use of a deadly weapon, which is an essential element of the offense. T.C.A. §§ 40-35-114, 39-13-03(b). The trial court declined to consider any of the other enhancement factors argued by the State because they were inapplicable, and the trial court did not find any applicable mitigating factors.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of eight years for aggravated assault and three years for felony reckless endangerment. If the misdemeanor reckless endangerment conviction was not required to be merged with the aggravated assault conviction, the sentence of eleven months, twenty-nine days would be appropriate. *See*, *e.g.*, *State v. Troutman*, 979 S.W.2d 271 (Tenn. 1998)(in misdemeanor sentencing "the trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute"); *State v. Johnson*, 15 SW.3d 515 (Tenn. Crim. App. 1999)(the trial court is afforded considerable latitude in misdemeanor sentencing). Defendant is not entitled to relief on this issue.

## CONCLUSION

Accordingly, we remand for the trial court to merge the conviction for misdemeanor reckless endangerment of Brandon Williams with the conviction for aggravated assault of Brandon Williams. We affirm all other aspects of the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE
